IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DUSTIN WAYNE POWELL,<br><br>and<br><br>TIPTON ASHBY KERNS II,<br><br>*Defendants.* | Case No. 1:22-MJ-33<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS**

I, Beau O. C. Bilek, being duly sworn, hereby depose and state as follows:

**I.     INTRODUCTION**

1.     This affidavit is made in support of a criminal complaint charging Dustin Wayne POWELL ("POWELL") and Tipton Ashby KERNS II ("KERNS") with conspiracy to distribute a mixture and substance containing a detectable amount of N-phenyl-N- [1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly referred to as fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

2.     I have been a Special Agent with the Drug Enforcement Administration ("DEA") since June of 2005.  Prior to my tenure at the DEA, I served as a Patrol Agent with the U.S. Border Patrol for more than five years.  As a Special Agent with the DEA, I have received specialized training in the ways, manners, and means used by those who unlawfully manufacture and distribute controlled substances.  I have participated in investigations involving unlawful narcotics distribution, as well as in the execution of numerous search warrants, which resulted in

1

the seizure of controlled dangerous substances and narcotics proceeds. Through investigations and training, I have also become familiar with the use by drug traffickers of telephones to communicate, the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the activities and nature of the profits from their illegal drug dealings.

3. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516(1) of Title 18, United States Code.

4. The information contained herein is based on personal knowledge, information provided to your affiant by sworn law enforcement officers, and information obtained from public records, cooperative witnesses, and other sources.

5. This affidavit is not intended to include each and every fact and matter observed by me or known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts which are necessary to establish probable cause to support the issuance of arrest warrants and a criminal complaint charging POWELL and KERNS for violations of Title 21, United States Code, Sections 841(a)(1) and 846.

II. **SUMMARY OF PROBABLE CAUSE**

6. The DEA and the Fairfax County Police Department ("FCPD") have been investigating numerous individuals who have been selling fentanyl and other opioids to individuals in the Eastern District of Virginia.

7. In or around July 2021, special agents with the DEA in Northern Virginia received information from their colleagues in the FCPD that a group of individuals who had been

selling small amounts of controlled substances to an undercover law enforcement officer had evolved into selling larger quantities of substances which tested positive for the presence of fentanyl. This undercover law enforcement officer (hereinafter "UC-1") is referred to in the masculine regardless of their gender.

8. UC-1 conducted a number of controlled purchases involving the defendants within the Eastern District of Virginia. Unless otherwise noted, controlled substances purchased have been submitted to a laboratory for testing and are pending analysis. During all of the controlled purchases involving UC-1, he was set up with remote transmitting devices to monitor the deals and ensure his safety. UC-1 was also under unbroken surveillance by numerous other law enforcement officers during all of the controlled purchases. After each deal, UC-1 was followed to a neutral spot by a detective from his unit where the substance UC-1 had purchased was initially analyzed and treated as evidence and processed per FCPD and later DEA policy.

9. In September 2020, UC-1 became aware of POWELL as someone who could provide illicitly obtained pharmaceuticals and other substances. Through the course of this investigation, UC-1 has met POWELL on numerous occasions and the identity of POWELL has been confirmed by comparison of his likeness to known photographs of POWELL. Through queries conducted in public records and law enforcement databases, agents have also been able to confirm that the phone number used by UC-1 for POWELL is indeed POWELL's. Agents have also confirmed POWELL's current address, where he has been observed on multiple occasions, as being located on the 13000 block of Coppermine Road in Herndon, Virginia (hereinafter the "POWELL RESIDENCE"). KERNS also resides at the POWELL RESIDENCE.

10. The first controlled purchase from POWELL in September 2020 was arranged through an intermediary and took place in a parking lot near a shopping center in Centreville, Virginia which is within the Eastern District of Virginia. During this deal, UC-1 provided $750 to an intermediary who exited the vehicle driven by UC-1 and walked a short distance away to another vehicle in the same parking lot. The intermediary met with a male who was confirmed, based upon the registration of the vehicle he was driving and phone analysis of the intermediary's device, to be POWELL. This intermediary later came back with thirty-one 30 mg. tablets which were later confirmed by a Virginia state forensics laboratory (Northern Laboratory) to be tablets consistent with a pharmaceutical preparation containing Oxycodone (Schedule II). There was no apparent tampering of the dosage units.

11. In October 2020, UC-1 was able to communicate directly with POWELL to arrange for another drug purchase which took place at a shopping center parking lot in Herndon, Virginia which is within the Eastern District of Virginia. POWELL provided UC-1 his phone number which he stated was 703-***-1517. UC-1 arranged to purchase Oxycodone tablets from POWELL. Prior to the deal, POWELL informed UC-1 that POWELL was sending his boyfriend "Joey" (later positively identified as KERNS) to the deal. During this deal, KERNS was observed by law enforcement arriving in a red Ford Explorer with a registered owner of POWELL at the POWELL RESIDENCE. KERNS parked next to UC-1 and was observed getting into UC-1's vehicle. UC-1 paid KERNS $800 for thirty tablets which were later confirmed by a Virginia state forensics laboratory (Northern Laboratory) to be tablets consistent with a pharmaceutical preparation containing Oxycodone (Schedule II). There was no apparent tampering of the dosage units.

12.     The next deal between UC-1 and POWELL took place in mid-November 2020 at a shopping center parking lot in Herndon, Virginia.  During this deal, UC-1 arranged to purchase Oxycodone from POWELL and inquired about purchasing fentanyl powder.  POWELL arrived at this deal with KERNS.  KERNS ultimately got into UC-1's vehicle and provided ten tablets to UC-1 in exchange for $300.  The tablets were later confirmed by a Virginia state forensics laboratory (Northern Laboratory) to be tablets consistent with a pharmaceutical preparation containing Oxycodone (Schedule II).  There was no apparent tampering of the dosage units.  POWELL told UC-1 that he would be able to provide fentanyl powder to UC-1 the following day.

13.     The following day POWELL confirmed with UC-1 that he could sell UC-1 fentanyl powder.  This deal occurred at the same shopping center parking lot in Herndon, Virginia, now familiar between UC-1 and POWELL.  POWELL arrived with KERNS and after parking near UC-1's vehicle, KERNS exited the vehicle driven by POWELL and entered UC-1's vehicle.  KERNS provided UC-1 with two grams of a substance (which later tested positive for the presence of fentanyl) in exchange for $260.

14.     In December 2020, UC-1 communicated with POWELL to purchase fentanyl.  UC-1 arranged to meet POWELL to purchase five grams of fentanyl powder.  This transaction took place in a shopping center parking lot in Herndon, Virginia, with POWELL communicating with UC-1 that he had the product.  After UC-1 arrived at the parking lot, KERNS was observed by UC-1 and law enforcement arriving at the deal driving a 2019 Toyota Rav4 vehicle.  In exchange for $650, KERNS provided UC-1 approximately five grams of a substance which later tested positive for the presence of fentanyl.  Following this deal, UC-1 spoke with POWELL about purchasing ten grams of fentanyl at a later time.

15. In January 2021, UC-1 communicated with POWELL inquiring about the purchase of ten grams of fentanyl. POWELL agreed to provide this amount for $1,100 and directed UC-1 to the shopping center parking lot previously used in Herndon, Virginia. UC-1 arrived at the parking lot at the appointed time and observed KERNS driving a red Ford Explorer registered to POWELL. KERNS got into UC-1's vehicle and provided UC-1 with approximately ten grams of a substance which later tested positive for the presence of fentanyl.

16. On March 2, 2021, UC-1 communicated with POWELL and they confirmed a location at a shopping center parking lot to conduct a ten gram fentanyl transaction for a total of $1,560. UC-1 arrived at this parking lot and observed POWELL and KERNS in a red Ford Explorer registered to POWELL. KERNS got into UC-1's vehicle and provided UC-1 with a bag of capsules which KERNS stated were full of "true" ten grams of fentanyl powder. The substance in these capsules later tested positive for the presence of fentanyl.

17. On May 5, 2021, UC-1 confirmed with POWELL to purchase ten grams of fentanyl powder for $1,300. At the agreed upon time, UC-1 arrived at the parking lot and observed KERNS a short time later arriving in a red Toyota Camry. KERNS got into UC-1's vehicle and after receiving the $1,300 provided UC-1 with approximately ten grams of a substance which later tested positive for the presence of fentanyl.

18. On May 22, 2021, POWELL texted UC-1 "Hey man, how's it going. My friend is picking up that stuff do u want some?"[1] UC-1 responded with "I could do 10 but I need a couple days to get the cash. He picking up now?" POWELL responded with "Okay cool that works. Yeah she is. Last time I used her ex boyfriend which was a lot easier to work with and

---

[1] All text from chats are typed as originally written including with respect to capitalization, punctuation, and spelling.

6

better prices. He was dealing out of the rumple inn near manassas park and I guess it was obvious because he got raided on Thursday and is in jail with no bond. She's the one who asked if u want any. But it's a good think u said a couple days because she's slow AF to do anything.. I told her you do not want it in caps. If she does that I will take it out for you myself and make sure it's right. Without a car I haven't been able to do much or is have someone else by now . At least with her it 100% no doubt it's good."

19. On May 24, 2021, UC-1 texted POWELL with "Yo I should have the money on Wednesday if she can get that for me." This was in reference to a planned transaction for ten grams of fentanyl. POWELL responded with "Okay I'll let her know." UC-1 later texted "Is she gonna be able to get it?" after which POWELL responded, "Yep she is."

20. On May 26, 2021, UC-1 confirmed with POWELL to purchase ten grams of fentanyl for $1,300. POWELL later messaged "Joeys gonna take care of it for me since I'm being admitted to landsdown hospital." At the agreed upon deal time, KERNS was observed by law enforcement entering UC-1's vehicle where he first received $1,350 before providing UC-1 with approximately ten grams of a substance which later tested positive for the presence of fentanyl.

21. In July 2021, UC-1 communicated with POWELL and requested another ten grams of fentanyl. POWELL responded that he was waiting on a delivery of fentanyl but would be ready soon. Later that day, POWELL stated he was able to provide UC-1 with the fentanyl he requested and directed UC-1 to the same parking lot in Herndon, Virginia where previous drug transactions had taken place.

22. POWELL was observed departing the POWELL RESIDENCE before surveillance was lost by following agents. UC-1 traveled to the parking lot he was directed to

and after parking observed POWELL driving a dark Volkswagen Passat Turbo Wagon registered to POWELL at the POWELL RESIDENCE into the same parking area. POWELL had not traveled directly to the parking lot and took longer than it would have taken to drive directly from his residence leading investigators to believe he had possibly met with someone beforehand. UC-1 walked over to POWELL who was seated in the driver seat of his Volkswagen where UC-1 and POWELL had a short conversation through the driver's side open window. POWELL provided UC-1 with a powdery substance in a plastic bag after being handed $1,300 in US currency. Lab testing on this substance confirmed the presence of fentanyl.

23. In September 2021, UC-1 contacted POWELL and again requested ten grams of fentanyl to purchase at the same parking lot used for previous transactions. POWELL and UC-1 arranged a time for the purchase. At the agreed upon time, UC-1 told POWELL he was about to arrive at the parking lot he had been directed to. POWELL told UC-1 that KERNS would be arriving shortly with the requested fentanyl. As UC-1 was parking, he and law enforcement observed the dark green Volkswagen Passat registered to POWELL park a short distance from UC-1's vehicle. UC-1 and law enforcement recognized KERNS as the driver and sole occupant of this vehicle. KERNS exited the Volkswagen and got into the front passenger seat of UC-1's vehicle. UC-1 and KERNS had a short meeting where KERNS provided UC-1 with approximately ten grams of a substance after being handed $1,300. This substance later tested positive for the presence of fentanyl. Law enforcement followed KERNS in unbroken surveillance as he first went to a Bank of America located at the south end of the shopping center parking lot where the deal had taken place. KERNS used the drive through of this bank and exited the bank being followed in unbroken surveillance as he returned to the POWELL RESIDENCE parking in the spot this vehicle was previously parked.

24.     In November 2021, UC-1 arranged to meet with POWELL to purchase ten grams of fentanyl for $1,300.  UC-1 also inquired about obtaining more fentanyl.  POWELL agreed to meet UC-1 later that day in a shopping center parking lot in Chantilly, Virginia, to conduct a transaction for ten grams of fentanyl.

25.     POWELL and KERNS were observed by law enforcement travelling to the parking lot in Chantilly, Virginia, where UC-1 had been directed to go. POWELL and KERNS pulled into the parking lot a few minutes after UC-1 arrived and parked near his vehicle. KERNS was observed getting into UC-1's vehicle and handed UC-1 a plastic bag containing a powdery substance and was in turn handed $1,300 from UC-1.  KERNS shortly thereafter was observed exiting UC-1's vehicle and returning to the Volkswagen driven by POWELL. Detectives were able to observe POWELL and KERNS counting this money before departing the parking lot.

26.     UC-1 continued to communicate with POWELL immediately following this deal to inquire about purchasing additional fentanyl.  This communication continued the following morning when UC-1 was directed to the same shopping center parking lot as the one used in the previous transaction in Chantilly, Virginia.  Law enforcement observed POWELL driving his registered Volkswagen with KERNS in the passenger seat and park near UC-1 at the appointed time.  KERNS was observed getting into UC-1's vehicle and provided UC-1 with five grams of a substance which later tested positive for the presence of fentanyl  for $600.

27.     In January 2022, UC-1 communicated with POWELL and requested another meet where UC-1 could obtain fentanyl.  At the appointed time UC-1 drove to and parked at the shopping center parking lot he had been directed to.

28. When POWELL arrived at the shopping center parking lot, he parked very near UC-1. UC-1 exited his vehicle and walked over to the driver side window of the Ford Edge driven by POWELL where they had a short conversation. UC-1 handed POWELL $1,300 in US currency and was given in return a plastic bag containing a small tin which itself contained a whitish grey powder believed to be fentanyl.

## CONCLUSION

29. Based on the foregoing facts, there is probable cause to believe that from at least on or around November 2020 through at least January 2022, in the Eastern District of Virginia and elsewhere, Dustin Wayne POWELL and Tipton Ashby KERNS II did unlawfully, knowingly and intentionally combine, conspire, confederate, and agree with others, both known and unknown, to unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of fentanyl a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

*Beau OC Bilek*

Beau O. C. Bilek
Special Agent
Drug Enforcement Administration

Sworn and subscribed in accordance with the
requirements of Fed. R. Crim P. 4.1 via
telephone to me this 22nd day of February, 2022.

Digitally signed by Ivan Davis
Date: 2022.02.22 13:18:56 -05'00'

The Honorable Ivan D. Davis
United States Magistrate Judge